UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | |
|---|---|
| IMRE KIFOR, individually and on behalf of all others similarly situated,<br>　　　　Plaintiff,<br>v.<br><br>THE COMMONWEALTH OF MASSACHUSETTS, GOVERNOR MAURA HEALY (official capacity), ATTORNEY GENERAL ANDREA CAMPBELL (official capacity), COMMISSIONER GEOFFREY SNYDER (official capacity, Department of Revenue, Child Support Enforcement Division), MIDDLESEX PROBATE AND FAMILY COURT, THE COUNSELING CENTER OF NEW ENGLAND, ATRIUS HEALTH, BARBARA A. DUCHESNE, and CYNTHIA S. OULTON,<br>　　　　Defendants. | **Case No:**<br><br><br><br><br><br><br><br><br><br>**JURY DEMANDED** |

CLASS ACTION COMPLAINT FOR RELIEF AND DAMAGES

**Violations of Title VI/VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000d/e, *et seq*.), Age Discrimination in Employment Act of 1967 (29 U.S.C. § 621, *et seq*.), Age Discrimination Act of 1975 (42 U.S.C. §§ 6101-6107), deprivation of civil rights (42 U.S.C. §§ 1981, 1983, and 1985), and systemic/sustained Civil RICO (18 U.S.C. § 1962) prohibited activities.**

Upon personal knowledge, the Plaintiff, Imre Kifor ("Father"), respectfully states as follows:

## **INTRODUCTION**

1) This case is a tragic, stubbornly child-predatory, and deeply child-abusive illustration of the universal reality and truth that "racial engineering[1] does in fact have insidious consequences."

   Fisher v. University of Texas at Austin, 570 U.S. 297, 331 (2013) (Scalia, J., concurring).

---

[1] The "racial engineering" in the herein context is hereby generalized to "social engineering" to also include discriminations based on sex, age, and national origin with the same consequences.

2) Ideally, government entities should not be capable of forming criminal intent. Government policy prohibits imposing punitive damages on public entities to be paid by taxpayers. While policy concerns for innocent taxpayer burden could be absent in the case of mere injunctive remedies, this complaint nevertheless contends that the many federal taxpayers are played against & defrauded with child-predatory schemes to benefit solely the few state taxpayers.

3) Father is a white male legal immigrant (and now a proud U.S. Citizen) who was granted political asylum in 1986 due to his "hated" ethnic minority status from a tyrannical Romania.

4) Understanding how communist tyrannies work, where authorities enforce rules differently based on the subjects' identity group memberships, Father meticulously collected the records of his long court proceedings in the Middlesex Probate And Family Court ("Family Court").

5) Father has been systemically defrauded, defamed and stereotypically discriminated against in Family Court using high-conflict "mental health" and other **false** child-abuse fabrications, as well as frequent stereotypically demonizing proclamations & malicious activist falsities like: **"Father is [a barbaric] Romanian"** and "[a categorically false] **rape was cost-effective**."

6) Building on his extensive (now spanning 10+ years) personal experiences, excessive harm, and injuries, Father has now substantiated allegations of stubbornly discriminatory, systemic, and sustained "social engineering" conspiracies and (Civil RICO) rackets by the Defendants.

7) To retaliate against a victim and then a whistleblower, Family Court had first labeled Father "dangerous" and later engaged in his total employment control, i.e., the alleged "conspiracy to silence and enslave." Specifically, Family Court has continued to commit the cited Civil RICO predicate acts while deliberately targeting, discriminating, and retaliating against the

now forcedly indigent Father as a series of specific and systemic disparate treatments (and not mere unintentional "disparate impacts") and Father continues to suffer irreparable harm.

8) The intentional sabotaging of Father's proper and lawful actions in Family Court, coupled with the allowed and encouraged endlessly frivolous and fraudulent complaints for contempt against him, have rendered a now almost **62** years-old Father absolutely unemployable with a just submitted **1,750th+** compliant job application and **$355,000+** of in-arrears obligations.

9) Father demands an accounting, monetary damages, punitive damages, and equitable relief.

## PARTIES

10) Father is a naturalized U.S. private citizen sheltering in Newton, MA, who was defrauded, defamed, and discriminated against by the Defendants' conspiracy to silence and enslave.

11) The principal class action Defendant, the Commonwealth of Massachusetts ("State"), is a state government with Governor Maura Healey (in an official capacity) and Attorney General Andrea Campbell (in an official capacity) as the proper and relevant legal representatives of the Commonwealth. The additional class action Defendants Family Court and Massachusetts Department of Revenue, Child Support Enforcement Division, ("DOR"), are governmental adjudicatory bodies or agencies with Commissioner Geoffrey Snyder (in an official capacity) as the proper and relevant legal representative for the DOR. A suit against any adjudicatory body or agency of the Commonwealth is the same as a suit against the Commonwealth itself.

12) The class action Defendant The Counseling Center Of New England (currently operating as LifeStance Health, Inc., of Scottsdale, Arizona) is a public corporation, a medical, mental health, and therapy provider with (former) headquarters at 1 Main Street Nashua, NH 03064.

13) The class action Defendant Atrius Health is a public corporation (and healthcare provider for adults and children at 30+ locations) headquartered at 275 Grove Street, Newton, MA 02466.

14) Father's former wife, the **non-class-action** Defendant Barbara Duchesne ("Mother-B"), is an individual residing in Westford, Middlesex County, MA. Father's former fiancee, the **non-class-action** Defendant Cynthia Oulton ("Mother-C"), is an individual residing in Concord, Middlesex County, MA. Both addresses are the Mothers' last addresses known by Father.

15) Father is a "person" pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, ("Title VI"), and State is a <u>Child Support Enforcement: Program Basics</u>[2], ("CSE"), "recipient" of Federal financial assistance, i.e., "the program is a federal-state matching grant program under which states must spend money in order to receive federal funding."

16) Pursuant to the Age Discrimination Act of 1975, 42 U.S.C. §§ 6101-6107, ("ADA"), Father is again a "person," while State violates the "no person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance" statute.

17) As established below (and argued at length in Father's attached Petition for Writ of Certiorari to the U.S. Supreme Court), Father is a "joint (and **not** direct) employee" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, ("Title VII"), 42 U.S.C. § 2000e (f) and State is Father's "joint employer" (i.e., it is acting as an absolutely controlling and systemically retaliating group) within the meaning of 42 U.S.C. § 2000e (b).

18) Pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.*, ("ADEA"), Father is again a "joint employee" and State violates the "it shall be unlawful for

---

[2] https://crsreports.congress.gov/product/pdf/RS/RS22380

[a joint] employer (2) to limit, segregate, or classify his [joint] employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age" statute.

## <u>JURISDICTION</u>

19) This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 18 U.S.C. § 1964(c), ("Civil RICO"), because it arises under the laws of the United States and is brought to recover damages for sustained deprivation of civil rights.

20) Further jurisdiction exists pursuant to 28 U.S.C. §§ 2201 & 2202 and based on 42 U.S.C. § 1983. Supplemental jurisdiction over Father's claims made under Massachusetts State law exists pursuant to 28 U.S.C. § 1367. State courts also have concurrent jurisdiction over all deprivation of civil rights and Civil RICO claims. Father's pending lawsuits in Family Court are specifically about the consequences of the ongoing conspiracy to silence and enslave by deliberately violating Father's constitutional civil rights (only to conceal the substantiated Rule 60 Fraud On The Court and the subsequently committed Civil RICO prohibited acts).

21) Each and all of the acts (or threats of acts) alleged herein were committed by the Defendants, or their officers, agents, and employees, under the color and pretense of the statutes, rules, and regulations of the Commonwealth. Therefore, the Court has personal jurisdiction because the Defendants committed the described tortious and prohibited ongoing acts in this district.

22) Nationwide service of process is pursuant to 18 U.S.C. § 1965(b). Father invokes this Court's diversity jurisdiction as parties from multiple states are involved. Father invokes jurisdiction under the Class Action Fairness Act as the dispute involves realized damages of $5,000,000+.

## VENUE

23) The venue is proper in this judicial district pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1391,

and 42 U.S.C. § 2000d/e because the Defendants reside and conduct business in this district

and a substantial part of the events and deliberate violations giving rise to the claims alleged

herein occurred in this district and because the alleged unlawful joint employment practices

were committed here, and relevant records to those practices are maintained & administered

here. The Defendants are jointly engaged in wrongful conduct in this district and have such

minimum contacts with this district that exercising jurisdiction is thus just and reasonable.

## ADMINISTRATIVE REMEDIES

24) Father could not have brought these connected and interdependent specific claims any earlier.

25) Father further states that he has exhausted his administrative remedies and complied with all

statutory prerequisites to his Title VII claims (see the attached EEOC "right to sue" notice).

26) Moreover, pursuant to the above-cited age (and employment) discrimination statutes, Father

has properly initiated all necessary inquiries and complaints with the EEOC, NLRB, the U.S.

Department of Labor, and the U.S. Department of HHS and has timely notified the U.S. and

Mass. Attorney Generals regarding his intentions to file herein complaint with this Court.

27) Father intends to amend this complaint with any further responses from those agencies.

## FACTUAL ELEMENTS OF TITLE VI AND ADA VIOLATIONS

28) The Federal CSE reimbursements are defined and reported to the U.S. Congress by the

Congressional Research Service ("CRS"): "The [CSE] program is a federal-state matching

grant program under which states must spend money in order to receive federal funding. For

every dollar a state spends... it generally is reimbursed 66 cents... Pursuant to Federal law, the court cannot retroactively reduce the [support] arrearages that a noncustodial parent owes."

29) "The CSE program provides seven major services on behalf of children: ... (3) establishment of child support orders, (4) review and modification of child support orders," "the child support order is established administratively through the state courts," "Federal law requires that states review and, if appropriate, adjust child support orders," and "effective review and modification of child support orders are important steps in ensuring that noncustodial parents continue to comply with realistic orders based on an actual ability to pay them."

30) Most significantly, "**[the] CSE programs usually rely on one of the parents to request a modification of the child support order**. It is important for parents facing ... substantial changes in circumstances to seek a modification to their order quickly so that they do not fall behind in their payments and thereby have to contend with past-due child support payments."

31) Title VI prohibits discrimination based on "race, color, or national origin ... under any program or activity receiving Federal financial assistance." However, private parties seeking judicial enforcement of the Title VI nondiscrimination protections must specifically prove intentional & directed discrimination, Alexander v. Sandoval, 532 U.S. 275, 280–81 (2001).

32) Understanding how raw nationalistic discrimination works in communist tyrannies, where authorities enforce rules selectively based on subjects' identity group memberships, Father has avoided identifying his national origin with anything more than a "not Romanian."

33) The original "Father is [a barbaric] Romanian" fabrication (the insinuated reason for the "Romanian Orphans" tragedy publicized on TV) has been upheld by Family Court since the child-predatory GAL investigation in 2011. Through years of litigation, Father consistently

informed that the U.S. had granted him political asylum in 1986 precisely because he was

"not Romanian, not Hungarian, not German, etc." (as per denials from all those countries).

34) Nevertheless, Family Court continues to restrict his ability to plead. This forced projection of

baseless and stereotypical "silenced prisoner" qualities onto Father is manifested in Family

Court directly resorting to the continued and deliberate deprivation of his civil rights and

Civil RICO predicate act violations while also actively retaliating against his defensive steps

of avoiding the now genuinely usurious debt from endlessly accumulating and by sabotaging

his proper and timely appellate reviews. This District Court noted on 11/22/2022: "Put more

simply, Kifor maintains that Family Court, on multiple crucial occasions, deliberately failed

to notify Kifor of its rulings, which resulted in Kifor not being able to appeal the same."

35) Father petitioned the Mass. Supreme Judicial Court ("SJC") for relief on 5/7/2023 with:

"Family Court's capricious or never communicated *ad hoc* 'gatekeeper orders' are arbitrary,

untraceable, and unappealable (they are not based on statutes) instruments that are the

definition of targeted discrimination and silencing retaliation 'backdoors' into the Family

Court's activist 'legal machinery' that Title VI was intended to prevent and eradicate," and

"the meticulously documented systemic child abuse and agenda-driven parental alienation

were effectively concealed when Family Court ignored Father's duly submitted filings on

2/3/2014 while stripping him of his protecting legal custody of his children. Predictably, this

occurred just after the first 12/5/2013 'gatekeeper orders' were issued by Family Court."

36) Father has also substantiated to the SJC that docket entries continue not to reflect the factual

reality of Father's proper filings and the court's orders. Father has claimed that the judicial

deadlock (purpose fabricated by Family Court through the allowed fraudulent and frivolous

complaints for contempt) was an endless "war of attrition" aimed at delaying investigations and denying Father's desperate requests for relief from his thus retaliatory forced indigency.

37) The DOR issued an Annual Notice Of Child Support Delinquency to Father on 3/7/2023 with the option to request a review. Father duly submitted his Request For Administrative Review on 3/25/2023. The parallel cases have now touched the entire spectrum of the CSE program's core services and incentive payments, in addition to the DOR's involvement since 2/19/2019.

38) The DOR's notice of delinquency confirms that the State has received financial assistance (or "Federal reimbursements"). Accordingly, Title VI applies to the CSE program's "review and modification of child support orders" core service. Moreover, the Family Court issued further oral "gatekeeper orders" during the 3/23/2023 dual hearings. Yet, Father has no confirmation that the hearings have ever even taken place. Therefore, appealing "the orders" is impossible.

39) Furthermore, ADA prohibits such age discrimination as age distinction does not affect the normal and efficient functioning of the CSE program's review and modification of support orders. Delays and refusals to act on requests for modifications (only to induce subsequent "downstream" age discrimination, as in this case) are direct discrimination and retaliation.

40) Despite Father's factual argument to the SJC, e.g., "all of Father's relevant evidence has been fully communicated and readily accessible as Father had e-filed his entire collection with the Appeals Court. Therefore, the Family Court's 'gatekeeper orders,' while unappealable, serve as secretive instruments to conceal the already substantiated fraud on the court," SJC-13427 ruled in an **endlessly circular** fashion on 8/8/2023: a) "to the extent he challenges the entry of interlocutory 'gatekeeper' orders... he could seek reconsideration of those orders" -- which is not possible in the purposeful absence of the actual orders, b) "to the extent he challenges

the entry of any final order of the Family Court, he may appeal from any such order" --
which is not possible in the purposeful absence of any final orders, and c) "to the extent Kifor
contends that the docketing of any order was delayed and that the appellate period lapsed in
the interim, a motion under Mass. R. Civ. P. 60 (b) (1) or (6) may provide a remedy" -- which
is what Father has been consistently and repeatedly attempting to do since 2018 (see Father's
latest "Renewed Motion(s) For Permission To File The Attached Refiled Motion(s) For
Relief Pursuant To Rule 60 Fraud On The Court [specifically, Mass. R. Civ. P. 60 (b) (6)]").

41) Consequently, Father claimed in his Petition For Panel Rehearing Pursuant To Sustained 42
U.S.C. §§ 1981, 1983, And 1985 Violations to the U.S. Court of Appeals, First Circuit, that
"the [SJC's] 8/8/2023 decision to once again fully ignore all of Father's timely and properly
filed substantiating evidence, even regarding an explicit conspiracy and racketeering for the
concealment of a Rule 60 Fraud On The Court by Family Court, is a new direct violation of
Father's constitutional rights for free speech (i.e., 'to petition the Government for a redress of
grievances'), due process (i.e., no 'gatekeeper orders' or the repeated preclusions of appeals),
and equal protection (i.e., no 'equity-based' discrimination due to race, sex, national origin,
and age). Father also argues that the timing of the 8/8/2023 decision, e.g., right after this
Court's 8/4/2023 abandonment of its months-long protection of Father's constitutional civil
rights by yielding to the [asserted] 'sovereign' state, is a materially significant factor."

42) The Erie doctrine is a binding principle where federal courts exercising diversity jurisdiction
to apply federal procedural law must also apply state substantive law, "in all cases where a
federal court is exercising jurisdiction solely because of the diversity of citizenship of the

parties, the outcome of the litigation in the federal court should be substantially the same ...

as it would be if tried in a State court," <u>Guaranty Trust Co. v. York</u>, 326 U.S. 99, 109 (1945).

43) Consequently, the SJC-13427 decision on 8/8/2023 also confirms that Father's repeated

requests for either interlocutory or final appeals of prior orders and his Motions for Relief

Pursuant To Rule 60 Fraud On The Court are according to the State's substantive laws.

44) Accordingly, Father submitted his attached civil rights violations complaint to the U.S. Dept.

of HHS, Office for Civil Rights on 9/13/2023. The agency responded on 9/25/2023 with

"[the] Commonwealth of Massachusetts is not operated by HHS, and does not receive funds

from HHS ... Therefore, OCR has no authority to investigate your complaint. We are closing

your complaint and will take no further action regarding the issue(s) you have raised."

45) The Dept. of HHS, Office Of Child Support Services, "is the federal agency that oversees the

national child support program." It publicly links to https://oig.hhs.gov/fraud/report-fraud/ to

"accept tips and complaints from all sources about potential fraud, waste, abuse, and

mismanagement." Father filed a "Federal Child Support Complaint" with OIG on 9/13/2023.

46) Father states that Family Court and State, in an explicit and deliberate collusion, are targeting

and retaliating against Father a) based on his race, sex, and national origin, b) with the herein

alleged conspiracy to silence and enslave, and c) in a now substantiated existential and age-

based "war of attrition" (by ignoring Father's complaints until his time ultimately runs out).

47) Specifically, the objective of these activities is to continue to delay and obstruct decisions on

Father's modification complaints, pursuant to conditions of the Federal CSE reimbursements,

until Father becomes silenced and enslaved (or **"expired enough" to complain any longer**).

network shall be drawn down at the **highest possible** rate of reimbursement ... as reported in the state accounting system for federal incentives and the network ... $38,887,046."[3]

59) Between 2012 and 2022 a total of $33M + $35M + $35M + $37M + $34M + $29M + $28M + $30M + $34M + $38M + $38M = $371M federal reimbursement amounts were reported.

60) Competing against all other states, this can be accomplished only by (1) targeting families with more resources, (2) maximizing each support amount by forcefully and fully separating children from their nonresident parents, (3) allowing fabrications of "high-conflicts" into the cases only to incentivize the "feeder network" of colluding professionals, (4) hiding the thus induced legal struggle by "cooking" the docket records, and (5) concealing any wrongdoing with protecting schemes from discovery, or appeals, and federal penalty inducing corrections.

61) **Interstate Commerce**. By the definition of this Enterprise, as it aims to maximize federal reimbursements (and their subsequent reinvestments in a positive feedback loop), the RICO interstate commerce requirement is satisfied by its direct effect on thus "federal" commerce.

62) The American Bar Association asserts: "It is estimated that only 10 percent of family law disputes end up going to trial, whereupon they take up the lion's share of work for family courts. One might assume that these rare cases exclusively involve highly complicated divisions of property or particularly irregular custody disputes. Instead, a significant percentage of the most fractious family law cases do not involve complex legal issues, but rather they involve individuals who appear to be bafflingly unable to resolve their disputes."[4]

---

[3] See https://malegislature.gov/Budget/FY2022/FinalBudget at 1201-0160.

[4] See https://www.americanbar.org/groups/family_law/publications/family-law-quarterly/volume-53/issue-2/confronting-challenge-the-highconflict-personality-family-court/.

63) The layman Father contends that law professionals, with "no skin in the game" yet obscenely lucrative incentives, are not just biased against American families but are also concealing the facts. Through this 12+ years-long pattern of "high-conflict" inducing "mental health" fraud, defamations, and discriminations, combined with the herein documented RICO schemes of concealment and retaliations, he has lost $1M+ in "legal fees" as part of his $9M in damages.

64) **Racketeering Activities**. This complaint refers to allegations of § 1961(1) obstruction of justice (and of state or local law enforcement), mail (and wire) fraud, and retaliation against a victim and informant as the offenses or "predicate acts" of the RICO racketeering activities.

65) Pursuant to Fed. R. Civ. P. § 9(b), the herein pleadings of fraud have time, place, parties, and content of the misrepresentations specificity, showing the deception by the communications.

66) The scheme behind the intent of the Racketeering Activities was to deceive a prepared Father in his affirmed efforts to appeal the Family Court's decisions and conceal from and sabotage any appellate reviews of filed evidence and/or docket entries. Mails and/or wires (internet and emails) were used to further this deception scheme with "property in Father's hands."

67) With severely restricted public access to Family Court's docket entries, Father's only option was to learn from and rely on mailed (or emailed) decisions when attempting to appeal them.

68) Family Court also had a duty to disclose their decisions. Yet, on multiple crucial occasions, Family Court deliberately omitted to notify Father altogether (allegedly to preempt appeals).

69) Father's relentless diligence (e.g., filing pleadings, affidavits, and exhibits throughout the ~80 hearings) was countered by Family Court's fraudulent concealment. This occurred through active misleading with affirmative steps or conduct (e.g., banning him from filing pleadings).

70) **Racketeering Schemes**. Multiple racketeering schemes have been deployed to silence and enslave Father, directly and/or proximately causing Father's injuries and pecuniary damages:

71) Secrecy Scheme: by not notifying him, Family Court preempted Father's chances of appeal (one cannot appeal an unknown ruling); Deception Scheme: deliberately asserting falsities in mailed orders caused confusion (and inordinate amounts of effort to correct); Ignore Scheme: Family Court ignored Father's verified submissions (to keep public records consistent with fraud); Retaliate Scheme: Family Court allowed or fabricated ambiguous contempt actions to keep Father under the endless threat of silencing jail sentences; and Usury Scheme: Family Court deliberately forced usury rates on a thus forcedly indigent Father only to enslave him.

72) By keeping docket records inconsistent with reality and by fabricating contempt actions to retaliate against a whistleblower Father, Family Court turned the wrongs to self-concealing.

73) **Patterns of Racketeering**. The above Racketeering Activities started less than ten years ago and have continued through related acts forming § 1961(5) RICO patterns of racketeering.

74) All the acts have the same or similar purposes, results, participants, victims, and methods of commission, or they are interrelated by specific characteristics and are never isolated events.

75) The patterns are open-ended schemes in that they have been an almost ten-year-long chain of related misconducts with a well-established threat of continuity. Despite Father being the only targeted person, 2 colluding Mothers, 3 independent Family Court dockets, 4 separate GALs, 7 consecutive judges, 21 doctors and therapists, and over 30 lawyers were involved.

76) Moreover, multiple simultaneous schemes have been active at all times. It is thus alleged that the intention had been to silence and enslave. Patterns of unlawful conduct exist with (1)

- 16 -

many predicate acts, (2) of differing variety, (3) over an almost ten years-long period, (4) on

multiple parallel (split) victims, (5) through separate schemes, and (6) with distinct injuries.

77) As adjudging complaints of contempt re: in-arrears child supports are part of Family Court's

regular way of conducting its business (with deliberately forced indigences and fabricated

child-predatory ambiguities aside), the threat of open-ended continuity (i.e., "past conduct

that by its nature projects into the future with a threat of repetition") continues to persist.

78) There is no reason to suppose that any of the alleged misconducts by the Family Court (e.g.,

retaliations and preclusions of appeals) would not continue indefinitely without this lawsuit.

79) Family Court's duties and the regular way of conducting business also satisfy the "vertical

relatedness" criteria as Family Court was enabled to commit the offenses solely because of

its position in the Enterprise and its involvement in and control over the Enterprise's affairs.

80) For completeness' sake, "horizontal relatedness" exists and is proven by the predicate acts

having similarities in purposes, results, participants, victims, and methods of commission.

81) A whistleblower Father exposed the underlying wrongdoings. Relatedness requirements are

satisfied as the Family Court's retaliatory acts are inherently connected to those schemes.

82) **<u>Culpable Person</u>**. Family Court is a member of the larger Enterprise as an entity capable of

holding a legal or beneficial interest in a property. As a trial court, Family Court has under

the "color of the law" jurisdiction and proper duty to manage and operate the various actors

involved in the different, and therefore distinct, events of the above legitimate Enterprise.

83) RICO claims may be appropriate against government employees who commit predicate acts.

84) By pretending to be an Appeals Court (i.e., denying appeals without appellate jurisdiction), Family Court has deliberately abrogated its absolute judicial immunity only to become a RICO culpable person, ensuring that distinction exists between the Enterprise and Patterns.

85) Moreover, as all of the above-cited RICO predicate acts were deliberately committed to a) discriminate (and later retaliate) against Father based on his race, sex, national origin, and now age, and b) deprive Father's constitutional civil rights only to knowingly conceal a now substantiated Rule 60 Fraud On The Court, State has also abrogated its sovereign immunity.

86) **Injuries.** Father is (1) a person (2) who sustained an injury (3) to his business or property (4) because the Defendants violated 18 U.S.C. § 1962. The RICO violations and Father's harm and injuries are independently alleged. Therefore, he has a standing for Civil RICO claims.

87) Father has realized economic injuries from herein interferences in his business or property.

88) The now forcedly indigent Father's significant financial and existential losses are concrete.

89) Father's injuries are also ascertainable and definable because he has been deprived of his ability to use or to transfer his now sole remaining property, his saved intellectual property.

90) Father's injuries have all been foreseeable and natural consequences of herein schemes.

91) Father's licenses were suspended on purpose. Family Court then deliberately ordered Father to seek unskilled work (i.e., requiring mandatory physical transportation). The thus forcedly indigent Father was later sentenced, and his pecuniary losses due to false imprisonment were discrete injuries to his business or property (that were not derivative of any personal injuries).

92) Father's access to the timely appeals process (Mass. G.L.c. 215 § 9) was repeatedly denied without explanations by Family Court, and Father suffered an injury to this property right.

93) Even the Chief Justice of the Family Court wrote on 3/6/2019: "If you believe that a final decision in your case is legally wrong, you may have a right to appeal the decision. There is also a right to appeal some types of orders that are not final, called interlocutory orders."

94) RICO injuries are the ones "by reason of" RICO violations, requiring direct relation (i.e., factual and proximate causations) between injuries asserted and injurious conducts alleged.

95) The Defendants' systemic and sustained allegedly wrongful conduct directly caused Father's economic losses as, therefore, intended consequences of the Defendants' unlawful behavior.

96) RICO injuries cannot be mere reaffirmations of previous acts. Father's business and property are directly contextualized and encapsulated by Father's software startup, Quantapix, Inc.

97) The June 2011 inception of the one-person company coincides with the start of the lawsuits in Family Court. Father's injuries to his business and property are tracked by his meticulous corporate records (all e-filed in court) showing direct causations other than "market factors."

98) Father's business or property (e.g., his professional reputation & ability to gain employment) have been directly damaged by the **false** public allegations about his "mental health," "rape, battery, violence, etc.," "child abuse," "financial control," and generic "toxic masculinity."

99) To escalate the child-predatory conflict to the limit, Family Court assigned notoriously cruel "high-conflict" expert GALs (the activist "feminist" Harvard psychologists Drs. Deutsch and Olezeski) to one of the cases to custom fabricate infantile and dogmatic crude narratives like: "[child] is afraid the Father will 'put suction cups on her feet and take her out the window,' and [child] is afraid Father would 'put him in boiling water' if he went back in Father's care."

100) As the biased GALs refused to consider the submitted extensive evidence (e.g., that directly contradicted their existing and boiler-plated "binary victim" scripts, i.e., "mother either lacks

affect or was bullied into abandoning her 3.5 yo Twins"), the "superstar" GALs' scheme of stereotypically targeted massive invalidations was obscenely profitable for them at ~$55K.

101) Family Court's assignment of the parallel GAL investigation (of effectively identical facts and events) to a balanced, but later bullied-in-court, Dr. Somers cost ten times less, at ~$5K.

102) **Classes of Injuries**. Father's injuries stem from (1) committed predicate acts, or 18 U.S.C. § 1962(c) violations; (2) the investment of racketeering income, or § 1962(a) violations; (3) the acquisition of an interest in and/or control over the Enterprise, or § 1962(b) violations; and (4) overt acts committed in furtherance of the conspiracy, or § 1962(d) violations.

103) § 1962(c) deception and retaliation violations of the "to silence and enslave" punishments are the (thus without jurisdiction) causes of Father's realized injuries (as they simultaneously remove any chances of judicial reviews & reparations) while also deliberately forcing him to succumb to his sustained monetary injuries as recovery is impossible from a $355,000+ debt.

104) § 1962(a) statutory reinvestment violations of previously received federal reimbursements have provided Family Court with limitless resources for its comprehensive "war of attrition" on Father to silence and enslave him, despite Father's supposedly "protected" indigent status.

105) § 1962(b) acquisition violations have provided Family Court with the means to expand the "feeder network" of professionals who would steadily supply fraudulently obtained "expert" or "trusted" opinions (in exchange for the thus allowed obscene profiteering opportunities) with a child-predatory "baiting and provoking a dedicated & loving parent" activist agenda.

106) § 1962(d) conspiracy violations have allowed Family Court to expand the sphere and the intensity of attacks and retaliations on Father without sacrificing its judicial and/or sovereign

immunity. The repeated filings of frivolous complaints for contempt and the arrest by the

Middlesex Sheriff can be attributed to the two conspiring/financially incentivized Mothers.

107) Father was not the direct recipient of false statements when the Mothers repeatedly filed

their complaints. The Family Court's subsequently mailed orders coerced him to obsessively

"seek work" (via 10+ submitted job applications/week), proximately causing his now 950+

rejected or ignored solicitations for work as he could not withhold his "pending legal issues."

108) **Collection of Unlawful Debt**. The initial child-abusive lawsuits were filed simultaneously

by Mothers. Due to false statements to the police, DCF, etc., they had fraudulent pretenses.

109) Therefore, Family Court awarded child support to only Mother-C in 2011. As Father had

been his Twins' sole (and full-time) custodian for the prior four years, Family Court falsely

imputed an income for him. That amount was later reduced. Mother-B was awarded support

only in 2014 after Father's custody was stripped following the secret "gatekeeping orders."

110) Family Court formulated the speculatively imputed off-and-on child supports in a deceptive

"gambling" style based on discrimination and deliberate & systemically fraudulent finances.

111) Since DOR's 2019 involvement, Family Court relied on weekly mailed demands to collect

the "unlawful debt" as an aggravated federal felony threat aided by the Mothers' conspiracy.

112) The forcedly indigent Father had diligently attempted to modify the ordered ~$5,000/month

obligations for his children since 2018, with the now 6th such attempt filed on 3/13/2023.

113) To avoid appellate reviews (and potential penalties), Family Court has resorted to RICO

predicate act violations. Specifically, Family Court directly sabotaged Father's defensive

steps to avoid the usurious now $355,000+ debt from accumulating. And then Family Court

immediately retaliated against Father when he started filing his complaints in other courts.

114) Despite Father's repeated requests for various reviews (of alleged and/or directly implied

deceptions and retaliations by Family Court), both DOR and State continued to collude with

Family Court's ongoing and now fully substantiated predicate act violations. Specifically, the

DOR stubbornly maintains a large discrepancy in Father's total owed obligations by entirely

ignoring the Mother-B matter and partially ignoring (2018 to 2019) the Mother-C matter.

115) **Statutes of Limitations**. Father first learned about his injuries from the trial testimonies

(and prior depositions) of Dr. Deutsch, Mother-B, and a police officer. Despite the police

officer's justification for not arresting Father (due to inconsistencies in Mother-B's story), the

"bullied" Mother-B's suborned perjury about her millions of dollars extorted from Father, the

GAL's deliberate deceptions (and her later "inability" to recall details of the investigations),

etc., Family Court secretly still proceeded to block Father's diligent efforts for self-defense.

116) Specifically, Father's submitted 110 pages affidavit of 973 verifiable errors in the GALs'

reports was immediately discarded and quietly buried by Family Court despite Dr. Deutsch's

testimony that she had directly relied on Dr. Olezeski's (now at Yale) defective, biased, and

sex-obsessed "psych testing" to conclude the activist "possible personality disorders" claims.

117) Family Court (and the conspiring Mothers) continued to use this "mental health" fraud and

defamation against Father to this day, despite his filing of repeated psychiatric evaluations by

3 Harvard clinical psychiatrists (seniors and superiors of the "activist" psychologist GALs).

118) The Family Court's unambiguous ruling, "On December 5, 2013, the Court denied Father's

request to submit additional evidence. The Court provided the following rationale: I

specifically find that the value of any evidence received from mental health treaters is

outweighed by the prejudice which would be supposed by [mother] in light of [Father's]

prior vigorous assertion of privilege and [the Mother-B's] inability to conduct discovery regarding such witness(es)," marks the **first** occurrence of the stream of RICO predicate acts.

119) Supported claims show that the "impounded" information was fraudulently concealed as Father could not discover the facts nor appeal the subsequent decisions despite his diligence.

120) Father argues that the statute of limitations is to be equitably tolled because he first learned about the official justifications of the causes of prior injuries from thus faulty, inconsistent, and secret Family Court docket entries served on him by the Assistant AG only on 8/9/2021.

121) While Father was aware of the injuries to his business or property (due to defamatory and discriminatory after-effects of the fraud-based police, DCF, GAL, etc. investigations), Father still could not discover the pattern necessary to overcome the immunities of the bad actors.

122) A disconnected pattern only started to emerge when two medical doctors (Drs. Goldsmith and Kurens from Atrius Health) openly conspired to forcefully medicate (and brainwash) his traumatized children (as a "protection" from Father's "toxic masculinity") while sending the children into the years-long colluding "care" of out-of-state doctors (Drs. Lawson, Gallagher, Tempesta, Katragadda & Magee) at The Counseling Center Of New England in Nashua, NH.

123) **<u>Diligence Efforts</u>**. To resist Father, they demanded that Family Court strip Father's legal custody of his Twins on 4/22/2013, lest they would "refuse to continue treating" the children.

124) Proof of Father's relentless diligence efforts in court is the Family Court's specific orders to severely restrict his filings (12/5/2013, 8/24/2018, 1/11/2019, 4/24/2019, 3/7/2023) and to ban his public complaints (9/26/2018, 4/11/2019), resulting in his now 500+ desperate open letters to officials, agencies, and the U.S. Congress, see a sampling attached as affidavits.

125) To further provoke the custody matters for direct court purposes while relying on fraudulent

medical insurance to remove traces of accounting, Dr. Goldsmith knowingly forced Father's

son to also undergo an unnecessary and painful "cancer" surgery at Mass. General Hospital.

126) Witnessing the little boy's deliberate medical torturing for Family Court's purposes, Father

withdrew legal consent from Atrius Health and The Counseling Center to treat his children.

127) The statutes of limitations clock is not affected by these discoveries. As only the necessary

other elements of the patterns were uncovered, proximately caused injuries were left intact.

128) **Injury Discovery**. Pursuant to this rule, Father was first injured by the first predicate act on

12/5/2013 when Family Court omitted mailing the above, thus, unappealable denial. Father

learned about it only after 6/30/2014. Therefore, a simultaneous appeal of the parallel and

colluding cases became predictably impossible (as the other judgment was dated 2/13/2014).

129) Federal law holds that limitation periods cannot begin until the cause of action is complete.

130) Father's cause of action was completed only on 8/9/2021 when he learned from AGO that

the 12/5/2013 secret denial was recorded in the Family Court docket entries 6+ months after

it could have been appealed, rendering the omitted mailings deliberate obstruction and fraud.

131) Father alleges a fraudulent direct obstruction, as (1) Family Court actively and wrongfully

concealed material facts relating to the wrongdoing; (2) the concealment prevented Father's

discovery of the nature of the claims within the limitations period; and (3) Father exercised

relentless due diligence in pursuing the discovery of the claims during the to be tolled period.

132) Confirmed proof of Father's forced unemployability arrived only on 6/3/2022 when Family

Court dismissed (with a canceled hearing) its secretive complaint for contempt as Father had

fully and unconditionally complied with the Family Court's all obsessive "seek work" orders.

133) The "preclusion of appeals" pattern was discovered when Father's first notice of appeal

(filed on 7/1/2019) was ignored by Family Court. It has existed since then through 9 out of

11 systemically ignored Notices of Appeals, all properly/timely filed on 7/1/2019, 11/7/2019,

1/7/2020, 2/12/2020, 6/24/2021, 6/29/2021, 7/18/2021, 8/18/2021, 8/25/2021, respectively.

134) Father's signed affidavits of indigency accompanied all his submitted Notices of Appeals.

135) The "preclusion of appeals" pattern was verified by the Appeals Court on 6/23/2022 by

noting, "As described infra, we consider only the appeals from judgments that are properly

before us: the denial of Kifor's motion for reconsideration in the Probate Court action with

Duchesne; and the June 4, 2021 order and June 23, 2021 dismissal in the Probate Court

action with Oulton." It was confirmed that crucial judgments of the cases (that all subsequent

contempt actions build on) are effectively unappealable, regardless of Father's proper and

timely repeated efforts, due to Family Court's deliberate sabotaging of the appeals processes.

136) Once again, Father diligently reiterated to SJC-13427 that "all of Father's relevant evidence

has been fully communicated and readily accessible as Father had e-filed his entire collection

with the Appeals Court. Therefore, Family Court's 'gatekeeper orders,' while unappealable,

serve as secretive instruments to conceal the already substantiated fraud on the court."

137) Nevertheless, SJC-13427 ruled in an endlessly circular fashion on 8/8/2023 that "to the

extent Kifor contends that the docketing of any order was delayed and that the appellate

period lapsed in the interim, a motion under Mass. R. Civ. P. 60 (b) (1) or (6) may provide a

remedy" - which is what Father has been consistently and repeatedly attempting since 2018.

138) Consequently, the SJC-13427 decision on 8/8/2023 also confirms that Father's repeated requests for either interlocutory or final appeals of the orders and his Motions for Relief Pursuant To Rule 60 Fraud On The Court are according to the State's substantive laws.

139) Father's now 5+ years-long diligent stream of timely and properly filed motions for relief (due to the fully substantiated Rule 60 Fraud On The Court) have consistently referred to the Family Court's actions (both leading up to the above-listed first Civil RICO predicate act and beyond), including the 12/5/2013 purely **"feminist equity"-based** but discriminatory denial.

140) In his 9/24/2023 complaint to the U.S. Department of Labor, Father wrote that "I can now prove to the U.S. Supreme Court that a self-referencing (or recursive) 'equity for all' leads to a famous and fundamental paradox inherent in all the Marxist (and Communist) 'specially protect from others' divisive social engineering ideologies." Accordingly, and questioning SJC-13427, Father's Petition for Writ of Certiorari to the U.S. Supreme Court is attached.

## **FACTUAL ELEMENTS OF DEPRIVATION OF RIGHTS**

141) Since January 2018, when Father first complained for modifications in Family Court, his court-ordered in-arrears obligations for his children have skyrocketed to $355,000+ from $0.

142) Father has diligently continued to request Family Court to modify the unrealistic orders.

143) Specifically, Father has submitted his complaints for modifications 6 times since 6/23/2022, the day of the "preclusion of appeals" pattern's verification by the Mass. Appeals Court.

144) Moreover, the forcedly indigent Father had no financial means to serve summonses.

145) Pursuant to M.G.L.c 261, § 27C, Father also submitted his motions to waive and affidavits of indigency to Family Court. Once again, the court failed to inform Father about decisions despite the concise language of the Indigent Court Costs Law. These new inconsistencies

confirm that the above racketeering schemes continue to be deployed in the conspiracy to silence and enslave. Specifically, email evidence from 2/23/2023 verifies that Father's timely requests to waive had been "referred to a judge," yet they were still missing from the dockets.

146) Reviewing the inconsistent dockets, the Appeals Court could only "remain convinced that the issues [i.e., the motion to waive] have never squarely been presented to the judge" but still could not know with any certainty on 3/1/2023. Despite clear-cut written evidence and simple underlying facts, the lack of any signed orders or acknowledgments by Family Court keeps creating purposeful ambiguities in the dockets that are even more amplified by the attorneys' allowed deliberately deceptive (or even flatly false) filings. For example, see the "Father agrees not to contact the children in any manner, phone, email, mail, in person, social media, or video conferencing" deception on 4/24/2019 and the false "Defendant's Motion to Dismiss Plaintiff's Amended Complaint for Modification" submission docketed on 3/3/2023.

147) After two interventions by the Appeals Court, Family Court ultimately resorted on 3/7/2023 to the "you need permission to file on these cases" arbitrary, capricious, and whimsical "gatekeeper orders." Once again, Family Court did not communicate the actual (appealable) silencing orders as Father learned about their existence only from the Family Court's register.

148) The never-before communicated and purposely silencing *ad hoc* orders can be characterized by the "an abuse of discretion is defined in this circuit as a judicial action which is arbitrary, capricious, or whimsical. *United States v. Wright*," Pelican Production Corp. v. Marino, 893 F.2d 1143 (10th Cir. 1990). Moreover, Father's repeated attempts to duly appeal the similar 6/13/2019 "gatekeeper orders" in the parallel case were also sabotaged using discriminatory

"Father is dangerous, writes too much, and is not cogent" direct references to his immigrant Romanian national origin and the purpose-fabricated purely activist "mental health" agenda.

149) Despite SJC's repeated denials of the requested scrutiny, the facts persist: crucial sequences of fraud-based rulings by Family Court have never been reviewed as the "ordinary appellate process" had been deliberately derailed and/or subverted only to conceal the child-predatory Rule 60 Fraud On The Court. Moreover, as no "adequate alternative remedies" exist for Father, specifically regarding his existentially damaging (and purely retaliatory) jail sentence, he filed a respectful Pardon Petition with the Governor's Executive Council on 12/5/2022.

150) While providing all the relevant material evidence, Father also petitioned the U.S. Supreme Court on 2/11/2023 by inquiring: a) did Family Court start a systemic Rule 60 Fraud On The Court by falsifying the docket entries in a defamatory, discriminatory, and child-predatory fashion in 2013 and 2014, only to conceal medical evidence of sustained activist "feminist" child abuse and torturing across state lines, b) has the deliberate withholding of Father's timely filed oppositions from docket entries ultimately caused the direct preclusion of any appellate reviews of the Family Court's judgments (e.g., the 2/3/2014 order to strip the protecting Father's legal custody), and c) have the Defendants conspired against Father's constitutional civil rights when systemically defrauding and defaming him and intently discriminating against him in an activist "feminist" manner, specifically through the child-abusive leveraging of Father's four children against him using endless forced isolation?

151) The continually repeated RICO predicate acts, e.g., retaliations and mail (and wire) fraud, as well as the obstructing "gatekeeper orders," not just directly infringe upon but also deny Father's constitutional civil rights for due process and equal protection in all his existentially

significant interactions with the activist, and thus discriminating, "under the color of law" Family Court. Specifically, not knowing if Father's filings and relevant evidence are ever even considered, and then being utterly unable to find out about any of the later decisions, is precisely what the herein allegations of conspiracy to silence and enslave intend to convey.

152) The Marxist (and Communist) "equity-based" justice has been the most effective formula in the tyrannies of the world to arbitrarily punish and efficiently eliminate entire classes of "dangerous elements" in their societies. Despite losing their small properties during WWII, Father's parents had been targeted and suffered greatly as "kulaks"[5] in communist Romania.

153) The same activist "equity-based" justice is practiced by Family Court when unconditionally accepting **any** dogmatic and stereotypical characterizations against Father (including the even contradictory mere insinuations) and rejecting **all** evidence brought in Father's defense.

154) Just like in communism, sudden "equity-based" justice is about the redistribution of wealth.

155) Therefore, despite the raging "men can get pregnant" federal debate, the State has declared its independence by "double protecting rights during a federal constitutional upheaval."[6]

156) Loudly "double-protecting" a numerically negligible minority is legally cost-effective in the bigger context of the legislated "maximized federal reimbursements," as double-protection would be legally wasteful otherwise. Moreover, direct protection for "men who cannot ever get pregnant" would lower the already maximized federal reimbursements. As Father has complained about the deliberate "castration of young American boys" by self-perjured child-

---

[5] https://en.wikipedia.org/wiki/Kulak

[6] See Scott L. Kafker, State Constitutional Law Declares Its Independence: Double Protecting Rights During a Time of Federal Constitutional Upheaval, 49 Hastings Const. L.Q. 115 (2022).

predator activists, Father has become "dangerous" in regards to the State's objectives to

prioritize the "men can get pregnant" agenda aimed at subverting federal procedural law.

157) Therefore, as the State now openly prioritizes that "men can get pregnant," and Father is

undoubtedly not a man who could ever get pregnant, he ceases to exist as a man worthy of

any protection by the State, regardless of any of Father's thus invalidated federal civil rights.

158) By allowing the falsifying of docket entries, the State now shifts the blame of knowingly

violating laws to suborning perjury onto the two Mothers, who have aided and abetted the

forcefully induced and false "Father 'willfully' neglected to pay child supports" findings.

159) Specifically, despite Father's arguments to the above "double protecting rights" SJC, e.g.,

"all of Father's relevant evidence has been fully communicated and readily accessible as

Father had e-filed his entire collection with the Appeals Court. Therefore, Family Court's

'gatekeeper orders,' while unappealable, serve as secretive instruments to conceal the

substantiated fraud on the court," SJC-13427 circularly ruled on 8/8/2023: a) "to the extent

he challenges the entry of interlocutory 'gatekeeper' orders... he could seek reconsideration

of those orders" -- which is not possible in the purposeful absence of actually dated orders.

160) Regarding the secretive (i.e., never directly communicated) "gatekeeper orders," the Single

Justice Appeals Court unambiguously characterized the controversy on 9/12/2023: "Neither

the petition nor the appendix identify any orders entered in the Probate Court within the past

30 days from which the petitioner seeks relief. It appears that the petitioner's request for relief

is that the single justice order the Probate Court to take certain actions related to the ongoing

proceedings. As the requested actions are not related to any specific interlocutory order

entered in the Probate Court in the past 30 days, all relief requested in the petition is denied."

## FACTUAL ELEMENTS OF TITLE VII VIOLATIONS

161) Father is a software engineer with a computer science/mathematics graduate degree. Father has worked all his life for his own software companies. Father sold one for $25M in 2000, with himself as the sole software developer. Despite Family Court flatly ordering Father to abandon his profession, only to seek the "silenced and enslaved" minimum-wage jobs, Father has not stopped working full-time on open-source software, see https://github.com/quantapix.

162) Father was first ordered to pay child support in June 2011, over 12 years ago. Between then and January 2018 (when Father first approached Family Court to seek urgent modifications and relief), he never missed any of his court-ordered ~$5,000/month support obligations.

163) Without considering the Civil RICO rackets, this U.S. District Court labeled Father's prior Title VII employment discrimination complaint "patently frivolous" by summarizing it on 12/7/2022 with: "that the Commonwealth may receive some federal reimbursement for state monies spent in enforcing child support orders against him does not create any sort of employer/employee or 'joint employer' relationship between the Family Court and Kifor."

164) That conjecture is inconsistent with the "federal receipts associated with the child support computer network shall be drawn down at the highest possible rate of reimbursement" State mandate from above. Specifically, federal reimbursements for all of Father's dockets would amount to $0, as the DOR has not been involved and spent nothing on enforcing Father's child support orders in both matters between 7/13/2011 and 2/19/2019. Since 2/19/2019, the DOR has attempted to collect only a partial (yet still impossible and now $129,419.31) from the thus forcedly indigent Father under blatantly fraudulent and/or frivolous circumstances.

- 31 -

165) Had the District Court's above conjecture been true (and absent the now substantiated Rule 60 Fraud On The Court and the purposeful deprivation of federal rights), the reimbursements specific to Father's meticulously documented 12+ years-long litigations in the Family Court would be minimized to an actual $0, in direct contradiction to the published deeply child-predatory priorities of the Massachusetts Legislature. The superficial conjecture would point to an economically ineffective federal reimbursement program as well, as it would promise numerical equivalent monies to what obviously cannot be collected, e.g., the DOR levied a) $85,880.40 on 4/13/2022 but Fidelity returned $85.06 on 10/11/2022, and b) $102,272.56 on 11/3/2022 but Fidelity returned only the last $80.79 from Father's SEP-IRA on 1/31/2023.

166) Father's continued compliance with all Family Court orders (duly confirmed on 6/3/2022, 3/23/2023, and also on 8/16/2023) has univocally demonstrated that Father's total inability to pay any of his accrued $355,000+ of in-arrears obligations for his children was due to a now-proven **absolute unemployability**, induced by the alleged conspiracy to silence and enslave.

167) Along with the secretive, ambiguous, endlessly fabricated, and, therefore, unreviewable contempt actions, the obsessive "seek work" orders reflect the autocratic intentions of the Family Court to control not just Father's employment but also his existence. And to such a degree that Father would be forced to disobey the orders, ending up finally silenced in jail.

168) Despite the "seek work" orders being employment traps, Father has complied with them all.

169) As they failed to work as intended, e.g., to silence and enslave Father, Family Court had to dismiss the secretly fabricated 1/11/2022 complaint for contempt. The 6/3/2022 hearing was canceled with the admission that "[Father] had been complying with all seek work orders."

170) Moreover, sequential hearings were held on 3/23/2023, where Family Court appeared to admit that Father had **not** been the "right candidate" for the retaliatory "seek work" program, as the Probation Department repeatedly requested the termination of the obsessive program.

171) As substantiated above, the racketeering Family Court has become Father's "employer" as a relationship exists between Father and Family Court, where Father is merely "performing a service" (of him simply being a custom-fabricated "non-custodial parent" fully separated from his four dear children for maximized support amounts) and from which Family Court openly derives a material economic benefit through significant federal reimbursements.

172) In the context of Father's full-time software engineering employment with Quantapix, his "service relationship" with Family Court would satisfy the conditions of the independent contractor test pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*

173) "The Act defines an 'employee' as 'any individual employed by an employer,' 29 U.S.C. § 203(e)(1). An 'employer' is defined as 'any person acting directly or indirectly in the interest of an employer in relation to an employee.' The Act further states that the term 'employ' includes 'to suffer or permit to work,'" <u>Baystate Alt. Staffing, Inc. v. Herman</u>, 163 F.3d 668, 675 (1st Cir. 1998). Specifically, in the context of the herein substantiated Civil RICO claims, 1) Father is free from Family Court's control to collect salary (from Quantapix) as long as a) he is paying the ordered child supports, and b) he is silent about needing appellate reviews, 2) software development has nothing to do with silently serving as a "non-custodial parent" for federal reimbursements in the Family Court's official business, and 3) Father continues to perform in a "professional capacity" for Family Court as a mere "white male with children."

174) Moreover, "joint employment" is expressly tested by: "in Bonnette, the court evaluated whether 'chore workers' who provided domestic ... services were employed jointly by the individual recipients for whom they performed services and the state agency administering the program. In concluding that the chore workers were jointly employed, the court looked in particular to four factors: whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate/method of payment; and (4) maintained employment records," Baystate Alt. Staffing, Inc. v. Herman, 163 F.3d 668, 675 (1st Cir. 1998).

175) Throughout the alleged conspiracy to silence and enslave, Family Court issued specific orders to tighten control over Father's employment and existence. As Family Court was only concerned with Father's "non-custodial parent" services (for federal reimbursements), his actual engineering expertise, training, skills, and 30+ years spent in his profession became irrelevant, and he was directly ordered to seek even unskilled, or "minimum wage," jobs.

176) Within the context of Father's fully degraded and degenerated services (i.e., a simple "non-custodial parent" serving as a mere fabricated, and later falsified, "docket entry" for federal reimbursements), Family Court has "under the color of law" power and jurisdiction to 1) "hire and fire" (order or cancel Father's child supports), 2) "supervise and control schedules/conditions" (of Father's support payments), 3) "determine [and enforce] rate/method" of all remittances (i.e., colluding against Father with the thus levying DOR), and to 4) "maintain employment records," (the also falsified docket entries as already substantiated by Father).

177) Father also holds that his forcedly induced circumstances satisfy the SJC's latest standard for determining a joint employment "service relationship" between Father and Family Court,

see <u>Jinks v. Credico (U.S.) LLC</u>, No. SJC-13106 (Mass. Dec. 13, 2021). Moreover, the now

"joint employer" Family Court has also deliberately created a child-predatory, discriminatory,

and hostile "work environment," pursuant to M.G.L.c. 151B. While Father has also had a *de*

*facto* full-time position in his own company, Quantapix, Inc. (that had been reliably paying

payroll and all ordered insurances for years), the Family Court deliberately and specifically

denied Father the option to continue with his 30+ year "tradition" in the 12/13/2021 "seek

work" orders. Family Court then claimed that Father was "not an employee," yet it continues

to **control all aspects** of Father's employment with a retaliatory "war of attrition" agenda.

178) Specifically, Family Court's own Probation finally filed to terminate the retaliatory "seek

work" program on 8/16/2023: "This Officer has recommended the termination of [Father's]

Seek Work participation on two previous occasions. Based on the information provided,

Probation does not believe that [he] is an appropriate candidate for the Seek Work program."

179) Pursuant to 42 U.S.C. § 2000e–2, i.e., "(c) It shall be an unlawful employment practice for a

labor organization [includes any organization of any kind, any agency, or plan so engaged in

which employees participate and which exists for the purpose of dealing with labor disputes,

or other terms or conditions of employment], -- (1) to discriminate against any individual

because of his race, sex, or national origin; (2) adversely affect his status as an employee or

as an applicant for employment, because of such individual's race, sex, or national origin; or

(3) to cause an employer to discriminate against an individual in violation of this section."

180) With the obsessive and retaliatory, and now also proven inappropriate, "seek work" orders,

Family Court and State (in explicit collusion) deliberately rendered Father to be **absolutely**

**unemployable** for any employer due to the submitted 1,750+ unsuccessful job applications, $355,000+ of accumulated in-arrears obligations, and 5+ years spent "seeking employment."

181) Accordingly, Father filed his attached complaint with the U.S. EEOC. On 9/6/2023, the EEOC wrote to Father, "This letter is to inform you that this office has determined that it lacks jurisdiction to investigate the above-referenced charge of employment discrimination."

182) Father's appeal to EEOC was dismissed with "This is in response to the above-referenced inquiry filed via the EEOC Appeal Portal on September 17, 2023. You identified the agency number as '523202303019' which is a charge number for discrimination complaints against a private sector employer. The Office of Federal Operations (OFO) does not have jurisdiction to review the work of EEOC District and Field Offices in non-federal matters" on 9/19/2023.

183) Alternatively, Father filed his attempt to charge with the U.S. NLRB. On 9/20/2023, the response was: "The NLRB does not have jurisdiction over public-sector employers such as the Commonwealth of Massachusetts. Our agency only has jurisdiction over private-sector employers. So, we would not be able to process any charge against the Commonwealth."

184) Subsequently, Father emailed his attached complaint to the U.S. Dept of Labor, Civil Rights Center on 9/24/2023. Referring to his second petition to the U.S. Supreme Court, Father noted: "As the consequences of President Biden's above executive order (e.g., mandating new 'Jim Crow'-like segregation of Americans into 'double protected with equity' and 'unprotected with no equity at all' disjoint camps), the implied 'American Gulag of leftovers' can be categorized only as a 'private sector employer' [**yet it is federally mandated**]."

185) On 10/13/2023, Father wrote an open letter to The White House requesting assistance.

186) On 10/27/2023, Father filed his attached Petition for Writ of Certiorari with the Supreme

Court presenting the following questions in the context of the "American Gulag of leftovers":

1. The "Sec. 8. Affirmatively Advancing Civil Rights ... to prevent and address

   discrimination and advance equity for all" clause of the 2/16/2023 Presidential

   Executive Order results in Russell's Paradox, and it must be corrected as a logically

   unacceptable conclusion to a less deceitful "equity for some." Is the mandate to

   selectively "advance equity" (for only some) Constitutional?

2. The Commonwealth of Massachusetts aims to "double protect"3 some citizens at the

   expense of revoking all protections from others, including Constitutional rights. Does

   "double protecting" some waive Constitutional protections for all?

### FACTUAL ELEMENTS OF ADEA VIOLATIONS

187) Father contends that his absolutely controlled "service relationship" with Family Court is

independent of any work he could perform (either as a skilled professional or an unskilled

laborer). Father has been thus degraded (through years of attrition) to a mere non-custodial

(i.e., male) parent (i.e., servant) for Family Court's federal reimbursements worth millions.

188) In light of Father's incessantly accumulating (now an impossible $355,000+) of in-arrears

ordered obligations, Family Court has become Father's not just "joint employer" but also his

genuine **"white" slave master**: "When the master can compel, and the laborer cannot escape

the obligation to go on, there is no power below to redress and no incentive above to relieve a

harsh overlordship or unwholesome conditions of work." Pollock v. Williams, 322 U.S. 4, 18

(1944). In the context of the herein alleged, therefore, "white" slavery, "[peonage] may be

defined as a status or condition of compulsory service, based upon the indebtedness of the

peon to the master. The basal fact is indebtedness," <u>Clyatt v. U.S.</u>, 197 U.S. 207 (1905).

189) Family Court's own Probation claimed on 8/16/2023: "It appears to this Officer that there

are numerous barriers to [Father's] employment, such as not being reachable by telephone,

and his full disclosure of multiple ongoing legal cases to potential employers." Father has

argued that this simplistic characterization is blatantly incomplete and outright deceitful.

190) Specifically, Probation was repeatedly informed that all of Father's screening interviews

were immediately canceled due to him now owing $355,000+ in (fraudulently) ordered child

support obligations (with $10K+ being a federal felony) and that he is almost 62 years old.

191) Moreover, potential employers easily communicated with Father without resorting to

phones but using email and Zoom. The interview on 9/7/2023 is the latest such example.

192) Father argued that Probation had never questioned any of his recent 950+ compliant job

applications, reports, responses, claims, filings, etc. On 8/16/2023, Probation still claimed,

"Regarding [Father's] forthcoming nature, Probation questions his authenticity and desire to

secure employment." Had Probation raised any "authenticity" or "desire" issues to Father, he

would have immediately addressed all of the concerns by providing his meticulous records.

193) Consequently, Father stated in his 8/17/2023 Petition For Panel Rehearing Pursuant To

Sustained 42 U.S.C. §§ 1981, 1983, And 1985 Violations to the U.S. Court of Appeals, First

Circuit, that "The Family Court's renewed 'under the color of law' decision to baselessly

insinuate once again questions of 'authenticity,' 'desire,' etc., regarding Father's character,

work ethic, and commitment to his children (without giving him a chance to defend himself

from the continued and massive invalidations) is a second new direct violation of Father's

constitutional rights for free speech (e.g., 'free disclosure to prospective employers'), due

process (e.g., no secretive, agenda-driven complaints for contempts from Probation), and

equal protection (e.g., no forcing the *pro se* Mother-C to file frivolous and fraudulent

complaints for contempts against Father). Once again, the timing is a significant factor."

194) Yet, pursuant to 29 U.S.C. § 623, "(d) Opposition to unlawful practices; participation in

investigations, proceedings, or litigation -- It shall be unlawful for a labor organization to

discriminate against any member because such individual has opposed any practice made

unlawful by this section, or because such individual has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or litigation under this chapter."

## SOVEREIGN AND ABSOLUTE JUDICIAL IMMUNITY

195) Regarding Title VI and ADA, "In the Civil Rights Remedies Equalization Amendment of

1986, 42 U.S.C. § 2000d-7, Congress abrogated the States' Eleventh Amendment immunity

under Title IX, Title VI, § 504 of the Rehabilitation Act of 1973, and the Age Discrimination

Act of 1975," Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 72 (1992).

196) Specifically, pursuant to 42 U.S.C. §2000d–7(a), "(1) A State shall not be immune under the

Eleventh Amendment of the Constitution of the United States from suit in Federal court for a

violation of ... the Age Discrimination Act of 1975 [42 U.S.C. 6101 *et seq*.], [and] Title VI of

the Civil Rights Act of 1964 [42 U.S.C. 2000d *et seq*.]." Moreover, "in notable contrast to the

other statutes discussed in this report, the Supreme Court interprets the requirements of Title

VI coextensively with the Equal Protection Clause of the Fourteenth Amendment."

197) Furthermore, "we have explained that discrimination that violates the Equal Protection

Clause of the Fourteenth Amendment committed by an institution that accepts federal funds

also constitutes a violation of Title VI," <u>Gratz v. Bollinger</u>, 539 U.S. 244, 275-76 n.23 (2003).

198) Meanwhile, "no State shall ... deny to any person within its jurisdiction the equal protection

of the laws," asserts the Equal Protection Clause of the <u>Fourteenth Amendment</u>.

199) Regarding requested prospective relief, "though a § 1983 action may be instituted, a federal

court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to

prospective injunctive relief ... and may not include a retroactive award which requires the

payment of funds from the state treasury," <u>Edelman v. Jordan</u>, 415 U.S. 651, 677 (1974).

200) Father's complaint for Title VII discrimination is not barred in this Court as Congress has

abrogated the sovereign immunity of a state by enacting the 1972 amendments to Title VII,

under the authority of 14th Amendment § 5,  <u>Fitzpatrick v. Bitzer</u>, 427 U.S. 445 456 (1976).

201) Moreover, pursuant to 42 U.S.C. § 2000d-7(a), "(2) In a suit against a State for a violation

of a statute referred to in paragraph (1), remedies (including remedies both at law and in

equity) are available for such a violation to the same extent as such remedies are available for

such a violation in the suit against any public or private entity other than a State."

202) Absolute judicial immunity uniformly applies to judges performing judicial acts within their

jurisdictions. The protection it affords applies even if the official "acted maliciously and

corruptly in exercising judicial functions" or "in the presence of grave procedural errors."

203) However, "A judge will not be deprived of immunity because the action he took was in

error, was done maliciously, or was in excess of his authority, but rather he will be subject to

liability only when he has acted in the 'clear absence of all jurisdiction,' *Bradley v. Fisher, 13*

*Wall.* 335, 351. Pp. 355-357." <u>Stump v. Sparkman</u>, 435 U.S. 349 (1978). "Immunity is

overcome in only two sets of circumstances. First, a judge is not immune from liability for

nonjudicial actions, i.e., actions not taken in the judge's judicial capacity. Second, a judge is

not immune from actions, though judicial in nature, taken in the complete absence of all

jurisdiction. *Bradley v. Fisher, 13 Wall.*" <u>Mireles v. Waco</u>, 502 U.S. 9, 11-12 (1991).

204) This complaint is restricted to only those judicial acts where a Family Trial Court (therefore

lacking appellate jurisdiction) pretended to be an appeals court. Father claims with specificity

that "in the nature of certiorari" acts were performed with "complete absence of jurisdiction."

205) Family Court's "with no jurisdiction" violations and "to silence and enslave" punishments

are the basis of Father's realized injuries, as they simultaneously remove chances of judicial

reviews and reparations while deliberately forcing him to succumb to his pecuniary damages.

206) Once again, Father reiterated to SJC-13427 that "all of Father's relevant evidence has been

fully communicated and readily accessible as Father had e-filed his entire collection with the

Appeals Court." SJC-13427 still ruled in an endlessly circular fashion on 8/8/2023 that: a)

"to the extent he challenges the entry of interlocutory 'gatekeeper' orders... he could seek

reconsideration of those orders" -- which is not possible in the purposeful absence of the

actual orders, b) "to the extent he challenges the entry of any final order of the Family Court,

he may appeal from any such order" -- which is not possible in the purposeful absence of any

final orders. Therefore, once again, the latest SJC-13427 decision is **biased and incomplete**.

207) It obstructs the documented possibility of a "with no appeals jurisdiction" Family Court's

deliberate preclusions (and the resulting impossibilities) of appealing their acts & decisions.

## SUPPORTED FACTUAL ALLEGATIONS

208) Due to "concern that professionals who provide service to the court will be harmed by what he puts out on the Internet," Family Court repeatedly denied (on 2/12/2018, 12/17/2018, and 4/11/2019) Father's desperate motions to publish to raise funds for his existential struggle.

209) Family Court's denials started after Father's 1/12/2018 **"castrating young American boys?"** email drew attention to his experiences with Dr. Olezeski and her fraud-based and child-predatory professional past (contrasted with her "Pediatric Gender Program" at Yale).

210) An Atrius Health attorney had already banned and threatened the never violent Father with police action, see "Re: Dr. Ronni Goldsmith and NO TRESPASS NOTICE" (11/17/2017) letter, "Re: voicemail" (1/3/2018) email, "Re: Atrius Health personnel" (10/16/2018) letter.

211) The superintendents of the two districts of Father's children's schools baselessly banned and threatened Father with police action (2/6/2018, 2/16/2018) for Family Court's purposes.

212) Father's rights to submit evidence and call witnesses (to prove his innocence and indigency) were then denied (12/17/2018, 4/24/2019, 6/6/2019, 10/7/2019, 10/22/2019, 12/2/2019).

213) As Father had been alleging documented child-predatory "mental health" fraud (2/20/2019, 4/11/2019), driven by discriminatory activism allowed in and encouraged by Family Court (12/17/2018), Father was labeled "dangerous" and was then forcefully silenced (4/11/2019, 4/24/2019, 6/6/2019, 10/7/2019), sent to jail (10/21/2019), and arrested again (1/21/2022).

214) The Family Court has dogmatically maintained that Father had been able to earn "at least minimum wage" (12/6/2019) and refused to accept his experiences of fraud, defamation, and discrimination. All of Father's requests for investigations and reparations have been denied.

215) Without due process, the Family Court canceled Father's entire professional life only to silence him, "So it's no more 'I have the software.' Go apply to jobs. Get a job" (4/24/2019).

216) Family Court's ambiguous routine orders were meant to forcefully keep "toxic fathers" in contempt of court (9/26/2018, 6/13/2019, 10/15/2019). The rulings failed to cover innocent scenarios when Father would only respond to his dear children contacting him (3/13/2021).

217) Family Court allowed subornation of perjury by an ARC on Father's children (4/24/2019), when claiming "both children were adamant that neither wants a relationship with Father," while ignoring Father's submissions once his children contacted him (7/15/2021, 1/21/2022).

218) The court-enforced and subsidized "supervised visitations" consistently targeted Father's bonds with his two daughters by relentlessly canceling and/or fabricating endless obstacles.

219) Father has documented that the fraudulently ordered 500+ supervised visitations with his four children were discriminating and harassing to him by coercing Father to endlessly take his children to the movies (where he could not nurture his connection with them) and in the dark theaters the "activist feminist" monitors forcefully separated Father from his daughter, while baselessly insinuating "protection" (i.e., proclaiming to Father "I need to protect you").

220) Family Court compelled Mother-C to serve her complaint for contempt (8/20/2019) only to close it without notice 2+ years later (12/13/2021). Father holds that a complaint closed on 12/13/2021 and another dismissed on 6/3/2022 should not result in still active complaints.

221) Only interested in "silencing by enslaving" a whistleblower, Family Court ignored Father's efforts and his ~800 solicitations for work that he emailed in full compliance (8/4/2019).

222) Monitored by the Family Court's Probation Department, an additional 950+ compliant job applications, accumulated from 10+ per week, were submitted more recently (10/31/2023).

223) As a now 61+ years old software engineer with 30+ years of professional experience, Father can either draw from his expertise or work as unskilled labor without any intellectual value.

224) The received feedback is clear: "You are not judged on technical merits by engineers; you are judged purely on legal merits (and risks) of your open lawsuits, and only by lawyers."

225) Father's forced and intractable indigency is exploited *ad infinitum* in Family Court through endlessly allowed, purposely ambiguous contempt actions (1/19/2019, 8/8/2019, 10/11/2019, 6/21/2021, 11/24/2021, 1/11/2021, 1/21/2022, 5/6/2022, 6/3/2022), that cannot be appealed.

226) The Family Court has delayed these actions (6/4/2021, 6/23/2021, 12/6/2021, 5/6/2022) while sabotaging their intended appeals (10/5/2020, 6/29/2019, 7/13/2021), only to forcefully interfere with the appeals process and the prosecution of Father's complaints filed elsewhere.

227) Father still has no driver's license (6/13/2019), he still has no cash, no car, nor any assets, no insurance of any kind, and he continues to be forcefully kept under an informal house arrest and in a "joint employment," rendering Father unable to "earn a living" (8/16/2023).

228) The Defendants subsequently conspired to sabotage Father's timely requests for appellate reviews of the orders. Accordingly, SJC-13310 affirmed that M. G.L.c. 211 § 3 "does not provide a second opportunity" for relief. Yet, the cited Appeals Court orders specifically excluded reviewing the faulty rulings regarding Father's forced indigency. The observation that "those appeals were not successful — that is, that they did not lead to decisions in [Father's] favor — does not entitle [Father] to additional review" is **biased and incomplete**.

229) Specifically, the whistleblower Father has alleged ongoing stereotypical discrimination by the Defendants. On 12/6/2021, the Family Court ordered Father to start all his employment relationships by directly compromising himself and deliberately withholding his materially

significant and verifiable "pending legal issues." The intent behind the now substantiated

conspiracy to silence and enslave is also clear: the obsessive "seek work" orders would either

silence Father by deliberately forcing him into jail (via involuntary "contempt") or enslave

him without any escape (via garnishing all his wages as per the 1/21/2022 "proposed order").

230) Father has now documented that docket entries in Family Court do not reflect the reality of

his filings and the court's orders. The inconsistencies are caused by the herein substantiated

racketeering schemes that have been deployed on purpose to silence and enslave Father.

231) The above-mentioned "Secrecy Scheme" (of Family Court withholding its decisions from

Father) was repeatedly perpetrated on: 12/5/2013; 2/12/2018 - for his 1/19/2018 motions;

7/1/2019, 11/7/2019, 1/7/2020, 2/12/2020 - for his four Notices of Appeals and indigency;

11/5/2020 - for decision revealed on 7/13/2021; 6/24/2021, 6/29/2021 - Notices of Appeals

and indigency; 8/25/2021 - Notices of Appeals; 12/2/2021 - for indigency; 12/13/2021 - for

closing a case; 1/21/2022, 5/6/2022 - for no decisions; 6/3/2022 - for dismissing a case.

232) The Deception Scheme (of Family Court claiming falsities in mailed orders) was repeatedly

perpetrated on: 9/26/2018 - building on trivially ambiguous 2/13/2014 judgment; 4/24/2019,

6/13/2019 - claiming agreement re: children; 8/22/2019 - claiming no harm, injury, damage;

8/8/2019, 10/21/2019, 12/6/2019, 12/6/2021 - claiming ability to pay/get hired; 6/16/2021 -

finally allowing indigency but sabotaging transcripts; 6/4/2021, 6/23/2021 - deliberately

claiming Appeals Court involvement despite knowing that the appeals had been sabotaged;

8/12/2021, 12/2/2021, 1/12/2022, 4/27/2022 - insinuating staged (but not forced) indigency.

233) The Ignore Scheme (of Family Court ignoring Father's filings and professional efforts) was

repeatedly perpetrated on: 8/24/2018, 6/6/2019, 8/8/2019, 10/21/2019, 6/23/2021, 12/6/2021,

1/21/2022, 5/6/2022, 6/3/2022 - as all of Father's filings were ignored/discarded; 1/6/2020 -

for acknowledging his ignored diligence; 8/8/2019, 12/6/2021, 1/12/2022 - as all of Father's

prior professional efforts (e.g., 800+ emailed solicitations for work) were ignored/discarded;

12/13/2021 - for ordering Father to abandon his company, all his past work (and intellectual

property) and to also effectively abandon his profession, education and 30+ years of skills.

234) The Retaliate Scheme (of Family Court allowing the relentless filings of fraud-based and

ambiguous complaints for contempt to keep Father under the endless threat of silencing jail

sentences, under implied house arrest, and fully isolated from his children) was repeatedly

perpetrated on: 1/29/2018 - for publicizing long-term child abuse; 1/29/2019, 8/8/2019 - for

inability to pay; 10/11/2019, 6/21/2020, 11/24/2021, 1/21/2022 - for inability to pay and for

contacting his children; 1/11/2022, 5/6/2022, 6/3/2022 - for his inability to gain employment.

235) The Usury Scheme (of Family Court exacting usury rates on a forcedly indigent Father only

to enslave him) was repeatedly perpetrated by a therefore also conspiring DOR and Probation

Dept. on 6/13/2019 - revoking Father's licenses; 3/4/2020, 8/1/2020, 4/27/2022 - refusing to

review; 12/18/2021, 12/21/2021 - threats of criminal complaint; 9/28/2023 - weekly demand.

236) The threat of continuity of Family Court's actions exists as Father's filings are still ignored,

hearings are held with no decisions, secretive filings (without notifications) are scheduled to

be heard, appeals are banned (or selectively processed), and Father's existential efforts (950+

recent job applications with ordered in-arrears child support obligations now at $355,000+)

are sabotaged. New rounds (the 6th) of complaints for modifications are also being ignored.

237) The mere presence of "men who cannot get pregnant" on Family Court's dockets provides

the State with legislated profiteering opportunities from open-ended federal reimbursements.

238) A superficial effort to loudly focus only on "double protecting" the few "men who can get pregnant" obstructs this child-predatory and unconstitutional practice and effectively renders the existence of the thus to-be-silenced and enslaved male targets outside of the applicability of laws and forces them into the grip of a newly emerging "American Gulag of leftovers."

239) In this context of **deliberately falsified** and obfuscated Family Court docket records (that even the Mass. Appeals Court cannot positively rely on immediately after fully substantiated trivial violations), it is manifestly impossible to start a "dangerous" case in Family Court or to later adequately appeal any final decision thus predetermined to be adverse judgments.

240) All aspects of Father's parallel modification and contempt actions have been extensively addressed and litigated in Family Court. There are no material facts left to be disputed by the parties. Therefore, Father filed his parallel Motions for Summary Judgment on 10/9/2023.

## CLASS ACTION ALLEGATIONS

241) The GAL, Dr. Deutsch, testified on 8/3/2012 that she had investigated 400 Family Court GAL cases, Dr. Daignault had ~900, Atty. Otis had ~60, and Dr. Somers had well over 200.

242) Father witnessed and personally documented these same "expert" professionals deliberately deceiving the accommodating Family Court even about the most trivially verifiable details.

243) The class, therefore, is initially defined as all individuals (i.e., majority white males) who have been compelled to proceed to trials in Family Court (10% of cases as per the ABA) due to alleged stereotypical invalidations and thus churned "activist" investigations (GAL, etc.).

244) Pursuant to Fed. R. Civ. P. § 23 (a), (1) the class is so numerous that the joinder of members

is impracticable[7]; (2) there are questions of law or fact common to the class; (3) the claims or

defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

245) Pursuant to Fed. R. Civ. P. § 23 (b) (3), (1) the questions of law or fact common to the class

predominate over any questions affecting only individual members, and (2) class action is

superior to other available methods for the fair and efficient adjudication of the controversy.

246) No unusual difficulties will likely be encountered in managing this action as a class action,

and the likelihood of any individual members prosecuting separate claims is remote.

247) Moreover, the alleged injuries were caused by a shared set of written misrepresentations.

248) Specifically, the same or similar misrepresentations were made to the named plaintiff (i.e.,

Father) in three separate Family Court dockets. Father is a representative plaintiff. He was

directly injured for relying to his detriment on the sustained and systemic misrepresentations.

249) Individual questions of causation cannot predominate as the same or similar representations

can be made to different members of the proposed class. Father claims that the Defendants

made "standard" misrepresentations. While each plaintiff must prove such reliance in this

case, Father believes (based on the nature of generic misrepresentations at issue) that the

circumstantial evidence that can be used to show reliance is common to the whole class.

250) Father further asserts that no more immediate victim is better situated to sue than him. The

questions of law and fact which are common to the entire class (and which predominate over

---

[7] The number and identities of class members can be determined through court records,
testimonies, and disclosures.

questions affecting any individual class member) are as follows: (a) whether the Defendants

have engaged in common law fraud and violations of civil rights; (b) whether the Defendants

violated Civil RICO; (c) whether the Defendants' unlawful acts resulted in unjust enrichment;

(d) whether Father and the class are entitled to injunctive and equitable relief; (e) whether the

Defendants' acts were willful, entitling both Father and the class to treble/punitive damages.

251) Moreover, Father is a member of the class. Father is committed to prosecuting this action.

252) Father's claims are typical of the claims of the other members. He has no antagonistic or

conflicting interests with those he seeks to represent. Father is an adequate representative of

the proposed class. Once again, the likelihood of individual class members prosecuting

separate actions is remote due to the relatively small loss suffered by each class member

(compared to the burden and expense of prosecuting litigations of this nature and magnitude).

253) Absent a class action, the Defendants are likely to avoid liability for their wrongdoing, and

the individual class members are unlikely to obtain redress for the wrongs alleged herein.

254) Adjudication of this case on a class-wide basis is manageable by this U.S. District Court.

255) As a materially significant fact of the matter, Father has been forcedly indigent since 2018,

and he alleges that his forced indigency has been the direct and foreseeable consequence of

the Defendants' deliberate actions and decisions substantiated throughout this complaint.

256) The layman Father has also been a *pro se* litigant without the ability to pay for services.

257) Father is not an attorney. Father cannot legally represent the described class in this Court.

258) Father continues to hold that he is a proper representative of the class. Therefore, Father is

prepared/ready to accept a precondition to the class certification that the class itself be legally

represented in this Court by a to-be-determined and retained attorney approved by this Court.

## CLAIMS FOR RELIEF

259) The preponderance standard of proof is used in the following short and plain claims. The intent is inferred from Father's repeatedly filed evidence directly showing that Defendants facilitated the violations and gained money or advantage at Father's expense. Father's injuries were both factually and proximately caused (the wrongful conduct is thus a substantial and foreseeable cause and the connection is logical and not speculative) by the alleged violations.

260) The injured Father has standing, and the proximate causes establish the Defendants' legal responsibility for Father's injuries. This Court is authorized to grant equitable relief to Father with thus proven damages to his business and property because of the Defendants' violations.

261) All alleged conspiratorial and fraudulent activities share the same pattern: the Defendants have claimed that they had acted to "protect the children" but knew all along that the children were being deliberately harmed. The Defendants wanted Father to believe their claims so Father would voluntarily agree with the Defendants' self-serving manipulations. Father felt that the Defendants "owned" the children (as he cannot ever get pregnant), so he complied with the demands and orders to his ultimate detriment: Father's forced unemployability.

262) Father has been consistently claiming that the Defendants have: (1) sabotaged and thus effectively silenced his diligent efforts to modify the underlying family matters due to now evidenced child-predatory fraud, and then (2) retaliated against the forcedly indigent Father to consequently enslave him through endlessly fabricated contempt actions by specifically targeting his ability to be gainfully employed in his profession or to simply "make a living."

263) Father's rights for free speech (including the right "to petition the Government for a redress of grievances"), equal protection, and due process have been violated "under the color of

law." These systemic violations, also spanning deliberate defamation & discrimination, have been actively perpetrated by the Defendants in an outright conspiracy with each other.

264) Mothers have continued to maintain and enforce frivolous public complaints for contempt against Father in Family Court only to conceal and preempt any of his attempts to modify the matters due to the systemic Rule 60 Fraud On The Court and stereotypical discrimination.

265) The staggering level of court-ordered accrued (yet fraud-based) debt & support obligations, $355,000+, combined with Father's proven forced indigency, renders Father unemployable.

266) As their conspiracy with racketeering, Mothers have also continued to effectively repress and torture their children by actively and directly alienating them from their loving Father.

267) This is a genuine, profoundly child-abusive, malicious, and ruthless controversy between Father and the Defendants as to his entitlement for reconciliation, emotional, personal, and paternal reparation, as well as payment of material damages and deliberately forced losses.

268) Father is entitled to a determination of his rights, including his parental rights, duty, and status under the terms of his acknowledged fatherhood, rightful employability, right to exist, right to earn a living, and the right to support his innocent and forcedly "fatherless" children.

269) Father's business or property (e.g., professional reputation and ability to gain employment) have been directly damaged by the false public allegations about his "mental health," "rape, battery, and violence," "child abuse," "financial control," and generic "toxic masculinity."

270) Father's already extensively documented monetary damages and losses are as follows:

| Property taxes | $25,125.00 |
|---|---|
| "Shared" house | $380,603.00 |
| "Big" house | $1,556,865.00 |

| | | |
|---|---|---|
| GALs' expenses | | $55,214.00 |
| "Therapy" expenses | | $157,288.00 |
| "Supervision" expenses | | $56,944.00 |
| Missed income (12 years) | $350K / year | $4,200,000.00 |
| Missed appreciation (33%) | ($1.5M + $234K) * 33% | $572,000.00 |
| Forced investments | Metrology instruments | $150,000.00 |
| Double taxation | | $65,000.00 |
| "Legal" expenses | $1,265,112 + $836,000 *pro se* | $2,101,112.00 |
| "Survival" expenses | 68 months x $2,836 | $192,848 |
| **Total damages/losses** | | **$9,512,999.00** |

271) Father is therefore claiming that a systemic and sustained conspiracy to silence and enslave him is behind the deliberate retaliatory actions by the Defendants. As substantial injury and sustained injustice incurred during Father's years-long forced indigency, any such conspiracy also constitutes Father's deprivation of liberty based on significant damages to standing in the community. Father has asserted sufficient facts that support his claims that he is foreclosed from a "range of opportunities" for employment or any income by the Defendants' acts.

## COUNT I - TITLE VI DISCRIMINATION

272) The statute reads: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

273) This Count is against all the Defendants ("Count I Defendant"), either directly or through aiding and abetting. The allegations of all prior paragraphs are incorporated herein by reference to show that Father's injuries were caused by the conspiracy to silence & enslave.

274) As substantiated in Father's attached Affidavit On Deliberately Induced Existential
Employment, Health, And Housing Crisis, the Count I Defendant simultaneously violated
Father's ultimate equity and constitutional civil rights when deliberately reframing, with
blatantly flawed (see SJC-13427) deductive logic, Father's unambiguously communicated
personal experiences. Father claims that Count I Defendant acted to continue to conceal and
obstruct the now substantiated conspiracy to silence and enslave the whistleblower Father.

275) Moreover, Father asserted, see his Affidavit On Petition For Writ Of Certiorari Submitted
To The U.S. Supreme Court, that "the thus deliberately induced judicial deadlock is a bona
fide 'war of attrition' strategy for delaying any investigations and denying [his] desperate
requests for relief from the thus retaliatory forced indigency," and "this war on Father meets
all the criteria for statutory discrimination and conspiracy to violate federal law on purpose."

## COUNT II - RICO § 1962(c)

276) This statute prohibits a person from conducting the affairs of an enterprise through a pattern
of racketeering activities. The allegations of all prior paragraphs are incorporated herein by
reference to show that Father's injuries were "by reason of" the committed predicate acts.

277) This Count is against State and Family Court ("Count II Defendant") as its culpable person.

278) The above Enterprise is an enterprise whose activities affect interstate commerce.

279) The Count II Defendant is associated with but separate from the Enterprise.

280) The Count II Defendant agreed to and conducted (or managed) and participated in the
conduct (or management) of the Enterprise's affairs through patterns of racketeering activity
and for the unlawful purpose of intentionally defrauding, silencing, and enslaving Father.

281) Specifically, (1) to directly sabotage, actively preclude, and deliberately obstruct Father's

diligently attempted appeals, Family Court repeatedly engaged in mail/wire fraud regarding

its discrimination-based orders (that were thus preserved and later metastasized by Family

Court without any appellate jurisdiction), (2) to effectively silence the whistleblower Father,

Family Court repeatedly retaliated against him by endlessly forcing him into fabricated and

ambiguous contempt actions, and (3) to enslave the forcedly indigent Father with no chance

of him escaping, Family Court continues to attempt to collect unlawful usury debt from him.

282) Pursuant to and in furtherance of its fraudulent schemes, Count II Defendant committed

multiple related acts of (1) mail and wire fraud, (2) retaliations, and (3) attempted collections

of unlawful usury debt (of now $355,000+ or ~$5,000/month) Racketeering Activities.

283) These constitute Patterns of Racketeering activities under 18 U.S.C. § 1961(5).

284) The Count II Defendant has directly conducted (and participated in) the Enterprise's affairs

through these claimed Patterns of Racketeering activities in violation of 18 U.S.C. § 1962(c).

285) As a direct and proximate result of the Count II Defendant's Racketeering Activities and

violations of 18 U.S.C. § 1962(c), Father has been injured in his business and property in that

the original fraud, defamation, and discriminations have been made persistent while directly

causing him therefore deliberately forced indigency and now demonstrated unemployability.

## COUNT III - RICO § 1962(a)

286) This statute prohibits a person from investing in an enterprise any income derived from a

pattern of racketeering activities. The allegations of all prior paragraphs are incorporated

herein by reference to show that Father's injuries were "by reason of" such investments.

287) This Count is against State and Family Court ("Count III Defendant"), as its culpable

person. The above Enterprise is an enterprise whose activities affect interstate commerce.

288) The Count III Defendant is associated with but is also separate from the Enterprise.

289) The Count III Defendant used and invested "federal reimbursement" incomes thus directly

derived from a pattern of racketeering activities (see prior count) in the interstate Enterprise.

290) Specifically, State has been collecting federal reimbursements as the direct result of its

fraudulently maximized (at all costs) child support orders, and these federal incomes were

then reinvested to finance the repetition (with no appellate jurisdiction) of Family Court's

racketeering activities (to enforce reimbursable child support collections at maximum rates).

291) The Count III Defendant benefited from violations under respondeat superior principles.

292) The Count III Defendant's racketeering incomes were reinvested in a way that hurt Father.

293) The Count III Defendant's reinvestments of racketeering incomes allowed it to sustain its

predicate acts, i.e., the repeated retaliations against the forcedly indigent Father via fabricated

contempt actions for collecting the usury ~$5,000/month rates of fraud-based child supports.

294) The Count III Defendant's reinvestments of racketeering incomes concealed its racketeering

activities by investing the incomes in covering up the fraudulent activity and deterring Father

with silencing and other existential threats from seeking assistance through appellate reviews.

295) These constitute Patterns of Racketeering activities under 18 U.S.C. § 1961(5).

296) The Count III Defendant has deliberately reinvested the incomes from its prior racketeering

activities through these claimed Patterns of Racketeering in violation of 18 U.S.C. § 1962(a).

297) As a direct and proximate result of the Count III Defendant's Racketeering Activities and

violations of 18 U.S.C. § 1962(a), Father has been injured in his business and property in that

all prospective employers of the forcedly indigent and almost 62 yo Father can ascertain that

he has no chance to realistically comply with any of the attempted collections of the thus

usury rates of ordered child supports by State financed with effectively unlimited federal

resources, rendering Father surely unemployable due to his immediate federal felonies.

298) These injuries are distinct from the damages caused by the commission of the alleged

original predicate acts and the patterns from which all the incomes were derived. They are a

direct result of the Count III Defendant's reinvestments of their racketeering income.

299) § 1964(a) also provides that courts may issue orders to prevent and restrain such violations.

## **COUNT IV - RICO § 1962(b)**

300) This statute prohibits a person from using a pattern of racketeering activities to acquire or

maintain control over an enterprise. The allegations of all prior paragraphs are incorporated

herein by reference to show that Father's injuries were "by reason of" the herein defendants'

continued acquisitions or maintenance of their interest in or control of the Enterprise.

301) This Count is against all the Defendants ("Count IV Defendant"), as its culpable person.

302) The above Enterprise is an enterprise whose activities affect interstate commerce.

303) The Count IV Defendant is associated with but separate from the Enterprise.

304) The Count IV Defendant acquired and maintained interests in and control of the Enterprise

through a pattern of "protecting" racketeering activities enforced by Family Court for them.

305) Specifically, as the Family Court's profiteering "trusted officers" (army of attorneys) and

assigned known child-predatory "experts" (i.e., activist GALs, therapists, doctors, supervised

visitation monitors), the Count IV Defendant deliberately (1) fabricated child-abusive "high-

conflicts" for Family Court's purposes of maximizing federal child support reimbursements

via thus allowed fraud, defamations and discriminations, (2) retaliated against Father when

he attempted to have the Defendants' actions leveraging his 4 children reviewed in Family

Court, and (3) collected unlawful usury debt (e.g., 10 times usual GAL expenses; ~$2,000/

week forced "therapy" expenses by 6 therapists as "[Dr. Deutsch] emphasized that [they]

need to be in very good treatment, not just with psychologists who take the insurance;" health

insurance premiums compromised by unnecessary and fraudulently insured "cancer surgery"

on a child; forced years-long and out-of-state medicating and brainwashing of children; etc.).

306) The Count IV Defendant benefited from violations under respondeat superior principles.

307) Pursuant to and in furtherance of fraudulent schemes, Count IV Defendant committed

related acts of (1) obstruction, (2) mail/wire fraud, (3) retaliations, and (4) collections of

unlawful usury debt (e.g., fraudulent and also exorbitant fees) Racketeering Activities.

308) These constitute Patterns of Racketeering activities under 18 U.S.C. § 1961(5).

309) The Count IV Defendant has deliberately acquired and maintained interests in and control

of the Enterprise through these Patterns of Activities in violation of 18 U.S.C. § 1962(b).

310) As direct and proximate result of the Count IV Defendant's Racketeering Activities and

violations of 18 U.S.C. § 1962(b), Father has been injured in his business and property in that

he suffered (1) pecuniary damages from inflated and fraud-based "professional services" and

(2) direct injuries to his professional reputation (and specifically to his business) from the

deliberately "canceling" frauds, systemic defamations, and stereotypical discriminations.

311) These injuries were caused proximately by the Count IV Defendant as a RICO "person."

312) It gained a dictating interest in or control of the Enterprise through the patterns of

fraudulent activities. Father's damages arising from these acquisitions and maintenance of

control of the Enterprise are distinct and different from the damages that flow from the above

predicate acts committed by Family Court to maximize federal child support reimbursements.

## COUNT V - RICO § 1962(d)

313) This statute prohibits a person from conspiring to violate §§ 1962(a), (b), and (c). The

allegations of all prior paragraphs are incorporated herein by reference to show that herein

claims do not stand alone and that Father's injuries were actually or proximately caused by

the Defendants' deliberate violations of RICO provisions (i.e., them knowingly agreeing to

facilitate others, but without them necessarily agreeing to operate or manage the Enterprise).

314) This count is against all the Defendants ("Count V Defendant"), as its culpable person.

315) The above Enterprise is an enterprise whose activities affect interstate commerce.

316) The Count V Defendant is associated with but separate from the Enterprise.

317) To establish the conspiracy, the Count V Defendant's agreement was substantiated: (1) to

the overall objective of the conspiracy (to facilitate the operation of the Enterprise through a

pattern of racketeering); and (2) that Family Court would commit at least two predicate acts.

318) One who knowingly participates in a conspiracy is liable for the acts of its co-conspirators.

Father was factually injured by the commissions of overt acts as part of the conspiracy.

319) Prior substantiating allegations enumerate the period of the conspiracy, the objective of the

conspiracy, and all the actions the alleged conspirators have taken to achieve that purpose.

320) Father's attached "Statement of Facts" substantiates his claims that Count V Defendant

reached an agreement to deprive him of constitutional rights (free speech, due process, equal

rights) and the right to appeal court decisions. Father thus alleges a "meeting of the minds."

321) The Count V Defendant agreed and conspired to violate 18 U.S.C. § 1962(a), (b), and (c).

322) Specifically, (1) the state Defendants agreed and conspired to use or invest income that was derived from the Family Court's pattern of racketeering activity in the interstate Enterprise, § 1962(a); (2) the corporate Defendants agreed and conspired to acquire or maintain interests in the Enterprise through the Family Court and its pattern of racketeering activity, § 1962(b); and (3) all the Defendants agreed and conspired to participate in the conduct of the affairs of the Enterprise through the Family Court and its pattern of racketeering activity, § 1962(c).

323) The Count V Defendant knew that the committed predicate acts were part of Patterns of Racketeering activities and agreed to the commission of the acts to further their schemes.

324) This constitutes a conspiracy to violate 18 U.S.C. § 1962(a), (b), and (c), in violation of 18 U.S.C. § 1962(d), without the necessity to prove that all Defendants knew all of the details of all of the unlawful racketeering activities or the number or identities of the co-conspirators.

325) As a direct and proximate result of the Count V Defendant's conspiracy, the overt acts taken in furtherance of the conspiracy, and violations of 18 U.S.C. § 1962(d), Father has been injured in his business and property in that the conspiracy among the Defendants effectively creates a "vicious cycle," as no member of the Enterprise is willing to consider providing any relief to Father from his material injuries without all the others simultaneously agreeing.

## COUNT VI - DEPRIVATION OF RIGHTS

326) The statute reads: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

327) This Count is against all the Defendants ("Count VI Defendant"), either directly or through aiding and abetting. The allegations of all prior paragraphs are incorporated herein by reference to show that Father's injuries were caused by the conspiracy to silence & enslave.

328) As substantiated in Father's attached Affidavit On Deliberately Induced Existential Employment, Health, And Housing Crisis, the Count VI Defendant simultaneously violated Father's ultimate equity and constitutional civil rights when deliberately reframing, with blatantly flawed (see SJC-13427) deductive logic, Father's unambiguously communicated personal experiences. Father claims that Count VI Defendant acted to continue to conceal & obstruct the now substantiated conspiracy to silence and enslave the whistleblower Father.

329) Moreover, Father asserted, see his Affidavit On Petition For Writ Of Certiorari Submitted To The U.S. Supreme Court, that "the thus deliberately induced judicial deadlock is a bona fide 'war of attrition' strategy for delaying any investigations and denying [his] desperate requests for relief from the thus retaliatory forced indigency," and "this war on Father meets all the criteria for statutory discrimination and conspiracy to violate federal law on purpose."

## COUNT VII - TITLE VII VIOLATIONS
### (Unlawful Race, Sex And National Origin-Based Discrimination)

330) Father repeats and re-alleges each of the prior allegations as if fully set forth herein.

331) Father has filed a charge with the EEOC and has exhausted his administrative remedies.

332) The Defendants have engaged in an intentional, sustained, and systematic pattern and/or practice of discrimination (and/or conspiracy and aiding & abetting to discriminate against) the predominantly male above elaborated "non-custodial parent" service provider "joint employees," who cannot ever get pregnant and cannot effectively "own" their children.

333) The Defendants have engaged in these activities by, among other things:

    a.     Repeatedly violating (and/or conspiring to violate) Father's constitutional free-speech, equal protection, and due process rights;

    b.     Continually holding (and/or conspiring to hold) Father in isolation, under implied house arrest, and in a state of deliberately induced forced indigency;

    c.     Repeatedly entrapping (and/or conspiring to entrap) the whistleblower Father in schemes designed to (effectively) silence and enslave him;

    d.     Repeatedly forcing (and/or conspiring to force) Father into impossible situations where he could be involuntarily held in contempt of either the law or of orders;

334) The Defendants' invidious race, sex, and national origin discriminations adversely affected the terms, conditions, and privileges of Father's employment (per 30+ years of profession).

335) The Defendants' discriminatory (and/or conspiratorial) conduct created an intolerable "non-custodial parent" service provider "joint employment" working environment for Father.

336) As a further direct and proximate result of said unlawful joint employment practices, Father suffered the indignity of discrimination and isolation (e.g., the implicit, years-long house arrest) and the continued deliberate invasion of his civil right to be free from discrimination.

337) As a further direct and proximate result of said unlawful joint employment practices, Father suffered extreme emotional distress, shame, intimidation, humiliation, indignation, isolation, embarrassment, and imminent fear of continued incarceration, silencing, and enslavement.

338) The Defendant's discriminatory and unlawful joint employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous

disregard of Father's federally protected civil rights and in a purposeful conspiracy with the substantiated sustained, systemic, and child-predatory racketeering (Civil RICO) schemes.

339) As a result, Father is entitled to compensatory and punitive damages.

## COUNT VIII - TITLE VII VIOLATIONS
## (Unlawful Harassment/Hostile Environment)

340) Father repeats and re-alleges each of the prior allegations as if fully set forth herein.

341) The Defendants' policies, practices, routines, and acts created an environment heavily charged with racial, sexual, and national origin-based discrimination and intimidation. These policies, practices, routines, and acts subjected Father to racially, sexually, and ethnically (national origin-based) hostile life, work, and mere personal existence environments.

342) As a further direct and proximate result of said unlawful joint employment practices, Father suffered the indignity of discrimination and isolation (e.g., the implicit, years-long house arrest) and the continued deliberate invasion of his civil right to be free from discrimination.

343) As a further direct and proximate result of said unlawful joint employment practices, Father suffered extreme emotional distress, shame, intimidation, humiliation, indignation, isolation, embarrassment, and imminent fear of continued incarceration, silencing, and enslavement.

344) The Defendant's discriminatory and unlawful joint employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of Father's federally protected civil rights and in a purposeful conspiracy with the substantiated sustained, systemic, and child-predatory racketeering (Civil RICO) schemes.

345) As a result, Father is entitled to compensatory and punitive damages.

## COUNT IX - TITLE VII VIOLATIONS
### (Retaliation)

346) Father repeats and re-alleges each of the prior allegations as if fully set forth herein.

347) When Father complained about the Defendants' racially, sexually, and ethnically (national origin-based) discriminatory policies, practices, routines, acts, and viciously hostile environment, the Defendants retaliated against him for his protected civil rights activity.

348) The Defendants took (and/or conspired to take) adverse action against Father to conceal and retaliate against him because he participated in protected activity. Father suffered emotional and realized material damages as a result of that conduct.

349) As a further direct and proximate result of said unlawful joint employment practices, Father suffered the indignity of discrimination and isolation (e.g., the implicit, years-long house arrest) and the continued deliberate invasion of his civil right to be free from discrimination.

350) As a further direct and proximate result of said unlawful joint employment practices, Father suffered extreme emotional distress, shame, intimidation, humiliation, indignation, isolation, embarrassment, and imminent fear of continued incarceration, silencing, and enslavement.

351) The Defendant's discriminatory and unlawful joint employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of Father's federally protected civil rights and in a purposeful conspiracy with the substantiated sustained, systemic, and child-predatory racketeering (Civil RICO) schemes.

352) As a result, Father is entitled to compensatory and punitive damages.

## COUNT X - AGE DISCRIMINATION (ADA AND ADEA)

353) The age discrimination statutes read a) "No person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance," and b) "It shall be unlawful for a labor organization to classify ... for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's age."

354) This Count is against all the Defendants ("Count X Defendant"), either directly or through aiding and abetting. The allegations of all prior paragraphs are incorporated herein by reference to show that Father's injuries were caused by the conspiracy to silence & enslave.

355) As substantiated in Father's attached Affidavit On Deliberately Induced Existential Employment, Health, And Housing Crisis, the Count X Defendant simultaneously violated Father's ultimate equity and constitutional civil rights when deliberately reframing, with blatantly flawed (see SJC-13427) deductive logic, Father's unambiguously communicated personal experiences. Father claims that Count X Defendant acted to continue to conceal & obstruct the now substantiated conspiracy to silence and enslave the whistleblower Father.

356) Moreover, Father asserted, see his Affidavit On Petition For Writ Of Certiorari Submitted To The U.S. Supreme Court, that "the thus deliberately induced judicial deadlock is a bona fide 'war of attrition' strategy for delaying any investigations and denying [his] desperate requests for relief from the thus retaliatory forced indigency," and "this war on Father meets all the criteria for statutory discrimination and conspiracy to violate federal law on purpose."

## **PRAYER FOR RELIEF**

WHEREFORE, Father and the class pray for relief and judgment as follows:

A) A declaration that Defendants, through the actions, omissions, policies, practices, and/or procedures complained of, violate Title VI (42 U.S.C. § 2000d, *et seq*.), Title VII (42 U.S.C. § 2000e, *et seq*.), ADEA - 29 U.S.C. § 621, *et seq.*, ADA - 42 U.S.C. §§ 6101-6107, 42 U.S.C. §§ 1981, 1983, and 1985, and Civil RICO - 18 U.S.C. § 1962;

B) An order certifying this case as a class action (with the understanding that the question of whether the Defendants deprived rights or violated Civil RICO is an issue distinct from whether each particular plaintiff is entitled to relief);

C) An order declaring that Father and the class were injured, harmed, and their rights deliberately violated by the Defendants and their unlawful activities;

D) An order enjoining the Defendants from their unlawful activities;

E) General and compensatory damages for the violations of federal constitutional and statutory rights and pain and suffering, all according to proof;

F) Punitive damages, according to proof;

G) Attorneys' fees, costs, interest, and expenses (or *pro se* equivalents) pursuant to 42 U.S.C. §1988 and other relevant statutes;

H) And any other or further relief the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Father demands trial by jury on all claims so triable.

## CERTIFICATION AND CLOSING

Under Fed. R. Civ. P. § 11, I certify to the best of my knowledge, information, and belief that this complaint (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Signed under the pains and penalties of perjury.

November 5, 2023,

Respectfully submitted,
/s/ Imre Kifor
Imre Kifor, Pro Se
32 Hickory Cliff Rd.
Newton, MA 02464
ikifor@gmail.com
I have no phone
I have no valid driver's license
I have to move to a homeless shelter
https://femfas.net/